Judge Cake.
In January, 1821, Milly Chavis .exhibited her petition to the County Court of Pittsylvania, praying to be permitted to sue Jas. dlrihur for her freedom, and stated the faets of her case. The Court proceeded in the regular way to grant the petition. The ease progressed; and after two continuances, came on for trial at the March 'Perm, 1S22. Doth parties seem to have considered themselves ready, and to have gone willingly to trial; as the record discloses no motion for a continuance. The Jury found a verdict for the Plaintiff, on which the Court rendered Judgment. (The Chancellor states in his opiuion, that a motion for a new trial was made to the Law Court, and overruled; but, the Law record attached to the cojiy of the Chancery record in my possession, shows no such motion, ft may, however, have been omitted, as I see that the Declaration itself is left out. It is clear, that there was no motion made, or that it was overruled.) The Defendant at Law then offered to the Chancellor a bill for an injunction and a new trial, on the allegation oí additional evidence discovered since the trial. The Chancellor refused the Injunction, and that refusal was approved by a Judge oi *143 fliis Court. A second bill was offered to the Chancellor, alleging a further discovery of new evidence. It was refused, and the refusal acquiesced in. A third bill was offered, refused hy the Chancellor, and granted by a Judge of this Court. The Defendant answered. A vast volume of evidence was taken, and on hearing, the Injunction was dissolved, and the bill dismissed; from which Decree, the appeal is taken.
The ground on which the pauper claimed her freedom, was, that she was the daughter of one Winny Chavis, a free woman; (hat between forty and fifty years before, when she was a girl of six or se-. yen years old, living with her mother in Brunswick County, she was stolen from her, carried to Pittsylvania by one Davis, and sold hy him to Bennett, who gave her to Jlrihur, his son-in-law. She is claimed by Arthur as a slave, born in Goochland County, the property of Humphrey Parish, who bequeathed her to his son Moses, who sold her when a girl of three or four years old to Davis, who sold her shortly after to Bennel, who gave her to Jlrihur. This is the chain of title on each side.
There seems no doubt, that there was a girl named Milly kidnapped from her mother Winny Chavis, and never after recovered by her. It is also pretty strongly proved, that there was a girl named ’ Milly sold by Moses Parish to Davis, and also that Davis sold a girl of that name to Bennel. It was, therefore, a question of identify. As grounds for a new trial, the bill states, that since the trial and the adjournment of the Law Court, the Plaintiff has discovered evidence to prove, that Polly M’Kinney, the principal witness of r.he Defendant, is unworthy of credit; also to prove the manner in which the Defendant received a scar on her thigh, which at the trial was relied on strongly, as identifying her with the stolen child: that he has also, since the trial, discovered the Will of Humphrey Par-to his son Moses a named the inventory of Humphrey Parish’s estate., in which Milly is named; a Bill of Sale from Moses Parish to Davis; and the widow of Moses, who gives evidence to the fact of her husband’s owning such a girl, and selling her to Davis. The bill docs not give us any information as to the time or manner, how and when all these discoveries were made.
The answer contests every inch of ground; puts the Plaintiff on the proof of his whole case; insists that from the nature of the case and the evidence, much of it musl, and all of it might, with ordinary diligence, have been known to him before the trial at Law; and that the allegation of these after-discoveries, ought not to be received bv (he Court, as no particulars of lime, place, or manner; ars *144 stated, so as to put it in the power of the -Defendant to disprove them.
. In ancient times, when the Courts of Law were strict and technical, and narrow in their proceedings, and new trials rarely granted by them, Courts of Equity were in the habit of exercising jurisdiction over trials at Law, and compelling the successful party to submit to a new trial, or be perpetually injoined from proceeding on his verdict. But, even then, they ne.ver interfered, unless a clear case of fraud or injustice were made out, or upon newly discovered evidence, which could not, with due diligence, have been used at the trial. As the Law Courts have become more liberal in granting new trials, Equity has, very properly, receded from the jurisdiction. I will not quote eases on this subject. The English Books aro full of them; and our own Court has often acknowledged their correctness. There is one Authority to which I will refer; it is the case of Bateman v. Willoe, 1 Sch. & Lefr. 201. Lord Redesdale, after laying it down as settled Law, that the inattention of parties in a Court of Law, cannot be made a ground for the interference of a Court of Equity, and that unless where a verdict has been obtained by fraud, or a party has possessed himself improperly of something, by means of which he has an unconscientious advantage at Law, Equity does not interfere, adds, “ But, without circumstances of that kind, I do not know that Equity ever does interfere to grant a new trial of a matter, which has already been discussed m a Court of Law, a matter capable of being discussed there, and over which the Court of Law had full jurisdiction. A bill for a new trial at Law, is watched by Equity with extreme jealousy. It must see that injustice has been done, not merely through the inattention of the parties, but some such reasons as those I have mentioned, must exist. ” Let us apply these principles to the ease before us.
The first defect in the Plaintiff’s case- which strikes me, is, that lie states not one fact or circumstance, as to the means by which, or the manner in which, he came to the knowledge of the new evidence; nor does this vast mass of testimony contain one atom ofevidenee op tins subject. The cases all state, that, “ it must appear to ihc Court;’, that “the Court must see,” &c. that the evidence has been discovered since the trial, and could not have been produced at it. Appear, how? How must the Court see it? By the bare statement of the Plaintiff, unsupported by .proof, though it is called for in the answer? Surely no! It must appear by evidence. The Court must see it by the proofs. If you hold'the Plaintiff to state in. his bill, how and when he came at the new evidence, a¡jd to support *145 his statement by proof, you enable the .Defendant to meet this proof; you give him something tangible, something that he can grapple with. But, leave it on the general statement, that the evidence has been discovered since the trial, without specification, without proof; and you not only relieve the Plaint ill' from the burthen oL proof, but put him beyond the power of disproof. Where is the hardship of requiring him to state, and to prove the means bjr which he acquired the new evidence? They must be within his knowledge, and susceptible of proof. Upon this general ground, then, I think tho Plaintiff’s case wholly defective. Bui, I will go further, and show from the nature of the new evidence, either that itmnsl, or that with ordinary diligence that it might, have been known before the trial.
The first ground for a new trial, is, to enable, the Plaluliff to impeach the credit of Polly M’Kinney. In the first place, it is a settled rulé, that a new trial will not be granted to enable a party to impeach the credit of a witness, examiiie.d at a former trial. Huish v. Sheldon, Sayer 27; Ford v. Tilly, 2 Salk. 053; Bunn v. Hoyt, 3 Johns. 256; Duryee v. Denison, 5 Johns. 249. But, passing that by, let us see whether, with duo diligence, all the evidence singe adduced to impeach the credit of Polly M'Kinney, might not have been had at the trial. Although tho affidavits accompanying the petition of the. pauper do not appear, it is most probable, that Polly FP Kinney's was one of them; because tho petition, referring to the evidence, relics on the scar, as one of the grounds to establish tho pauper’s freedom; and Polly M'Kinney is the only witness who proves that the. stolen child had such a scar. But, if this were, no’ so, Polly M'Kinney's deposition was taken in March, 1821, onh r.wo months after the suit brought, and twelve months before the tri el. From the first it was known, (hat Polly M'Kinney was an im - portant witness. She had always lived in Brunswick, had moved in a low and narrow sphere; her first deposition was taken in Brunswick, in the presence of an Agent of Arthur. All the evidence to impeach her (and this evidence could only consist of general reputation as lo her credibility, not particular facts) must of course he looked for in her neighbourhood; and it cannot bo conceived, that, with tolerable diligence, the Plaintiff could not have examined every witness, who knew any thing about her, before the trial. The answer, indeed, states that her character was assailed by evidence before the Jury; and this allegation is responsive to the bill.
The next allegation is, that he has, ,since the trial, discovered evidence of the cause of the scar, shewing that it was received while Milly was in the service of Bennett, and after she was *147 a woman. The principal witness as to this, is Sally Wallace. .She lived within a mile or so of the Plaintiff. Two or three others of the County are also examined, who speak of seeing her lame, of seeing blood, of bearing it said that Milly had fallen into a potatoe hole and hurt her thigh; and Bennett, the father-in-law of Arthur, and former owner of Milly, is one of thorn. Now, is it conceivable, that this evidence should not have been known (if true) before'the trial? What was there in the trial itself, to open Ihesenew floods of light upon the Plaintiff? It was known from the first, that the scar being on the kidnapped child, and on Milly, was relied on as a strong proof of identity. It must have been, (and the answer says, was) the subject of much conversation in the neighborhood; among the parties especially, it must have been frequently talked of. How can we imagine, that Arthur and his father-in-law did not canvass the matter, and that the latter did not tell of the fall and wound which Milly had received while in his service. With me the conclusion is strong, cither that Bennett told Arthur of this before the trial, or that it is all a fabrication, and made up since; and this, by the way, is one of the strong objections to granting these new trials for after discovered evidence, especially when that evidence does not consist of written documents, but of vive voce testimony. On a trial at Law, all the strength and the weakness of the case is disclosed. To suffer the loser, after this, to hunt up evidence, and get a new trial, on the bare statement that he did not know of it before, would be to hold out a strong and dangerous temptation to subornation of perjury; and the mischief of such a practice could not be more strongly exemplified than in -the present case. The party went freely to trial. As soon as the went him, he, various scours the Country, and the adjoining Stales of Tennesee and Kentucky; and a first,- a second, and a third bill is filed for a new trial; each successiveattemptfortificd by additional evidence,as the stock on hand was found insufficient; and the result is such as might have been expected. For, no one can look into this record, without sickening at the mass of pollution which it presents. With respect now to the documents, which are supposed to show that Milly was a slave, and came from Goochland; could not the Plaintiff, with reasonable diligence, have discovered this evidence before the trial? From the moment the claim to freedom was sot up, his mind must have been turned to tracing the title of those under whom he held the pauper. It is acknowledged on the record, that before the trial at Law, the Plaintiff had the depositions of the Parishes of Goochland, stating, that on the division of their father’s estate, a small mulatto girl, named Milly., was allotted to their brother Moses, and that he told them he had *148 sold her to one Dams, of Pittsylvania. This proves, that the Plain-Till' knew where to look for evidence. Nothing was more natural than for him to look in the Cleric’s Office of Goochland for the Will and I a vento ¡y oí 1:1. Parrish, if he thought them material; though I cannot see that they were, as the facts of which they speak, were equally proved by the Parishes^ Are we not bound, also, in reason, to roueiudc that when the Parishes give evidence of the possession by their brother of the girl, and his sale of her to Davis, they would also tell the Plaintiff that HJoses had removed to Kentucky, and that >;is widow still lived there. We see that soon after the trial he sent to Kentucky, and took her evidence. There was nothing in the fact of the trial to give him this information; though that fact might quicken his diligence. Several witnesses; too, state, that before the Trial, they heard the Plaintiff speak of getting the evidence of Mrs. PaAsh of Kentucky. I rely, however, much more on the circumstances, to show, that with diligence, her evidence might have been had, than on their testimony; for, their credit is strongly impeached.
The only remaining evidence, on which the new trial is asked, is, the Bill of Kale from Parish to Davis. It is equally clear to me, that this also might have been had at the trial, with proper diligence, it was known from the first, that Bennett got MUlif from John Davis. The Bill of Sale from Davis to Bennett (in possession of the Plaintiff) showed that fact. Davis had lived in Pittsylvania. It is well known in that County, that about twenty-one or twenty-two years before, be had removed to East Tennessee, Green County, and settled on Kick Creek, near Jonesborough. This is proved by Kirby. Parker and Walker also prove his removal to Tennessee. These witnesses are examined by the Plaintiff. Why., then, could not the Plaintiff, as well before as after the trial, have sent to Tennessee? Ought he not, in common prudence, to have made enquiry concerning this link in his chain of title, and must he not naturally have gone to make enquiry, to the neighborhood from which Davis had moved?
I have thus gone through the grounds slated for a new trial. I have shown (Í think) that they ought not to be considered, because they are so defectively stated, as to disable the Defendant from meeting and disproving them; but if considered, that they are utterly insufficient to support the motion for a new trial.
I ought, perhaps, to have noticed a fact, which, though not stated in the bill as a cause for a new trial, the Plaintiff or his Agents seem to have been at great pains to prove; that is, that the Plaintiff is a man of very weak mind, incapable of attending to business, and that by interrogation he may be made lo saj1- almost any thing. If this *149 be So, how is it that we have before us three long bills, slating, in the person of the Plaintiff, with greatminutenessof detail,a variety of complicated facts, and sworn to by him? No man can examine these bills, without coming to one of two conclusions; either that the Plaintiff is not the man this evidence would make him, or that there has been foul play in this business. But, if the Plaintiff was weak, it. would furnish no ground for a new trial. He had sons, wo see, who acted for him. fie had other agents also. In addition to this, it seems, that the children of Milly were owned by several persons; and every owner would of coui’se feci an interest, and take a part in the matter. Surely, all this array must be considered fully equal to bringing out all the Plaintiff’s evidence at the trial, and more than a match for the pauper, a woman of colour, who had been held from her childhood in slavery, and who had to tak.e the burthen of proof, and establish her claim to freedom. Let no one take alarm at this remark, as if I were placing the question of freedom on different grounds from any question of property. I-mean no such thing. But surely, it ought to stand on equal ground. When the imbecility of the master, who claims property, is urged as a cause of new trial, the imbecility of the pauper, who is claiming freedom, should also be considered, especially as every application for anew trial is to the sound discretion of the Court.
The case of Swinnerton v. The Marquis of Stafford, 3 Taunt, 91, was cited in the argument, to show that a Court will sometimes grant a new trial, although conflicting evidence has been submitted to the Jury, and they do not think the verdict wrong. It must surely be admitted, that this is in direct opposition to the general rule. That rule, as drawn from the latest cases, especially the case of. Cairstairs v. Steene, 4 Mau. & Selw. 192, Is thus clearly laid down by StarJáe on Evidence, vol. 1, p. 437: ‘‘The Courts do not interfere for the purpose of granting new trials, but in order to remedy some manifest abuse, or to correct some manifest error iu Law or fact. Where there is a contrariety of evidence, the Court will not grant a new trial, unless it clearly appear that the Jury have drawn an erroneous conclusion, even although there are circumstances in the case, pregnant with suspicion, and which lead to a contrary conclusions or, although the verdict be contrary to the opinion and direction of the Judge who tried the cause;” that is, his opinion upon the weight of evidence. This is unquestionably the general rule. If, then, the case in Taunton be good Law, it must be because the special circumstances of that case make it an exception; and this is the ground, on which the Court who decided it., seem careful to placo it; and every case which leans on that as Au~ *151 ihority, must bring itself clearly within it; as these exceptions to general rules are taken strictly, particularly where latitude would trench seriously upon the province of a Jury. The case from Taunton was an issue under an Inclosure Act, to try whether the Defendant, who was seised in fee of a tenement in the occupation of a Tenant name Knight, had a right of common in respect of that tenement, over Mothersall Common, the waste directed to be inclosed. It was a question, which carried the parties back into remote antiquity. The trial waáinlSlO. An old grant to the priory of Stone,brought from the Cottonian M. S. S. was offered in evidence; also another graut made to the same priory in 1342. There was much conflicting parol testimony also, on both sides, as to the question whether the Tenants had been accustomed to turn out their cattle on the locus in quo, or on one of the two adjoining commons; the three commons being of great extent,1 running for" miles, all uninclosed, and cattle passing from one to another. There were only seven months from the decision of the commissioners, to the trial of the issue. Under these circumstances, the Court decide, that where there has been but a short time for investigating a question" of real properly, of a doubtful and obscure nature, and of great value, although conflicting evidence has been left to the Jury, and the Court does not think their verdict wrong; yet, if the inheritance is to be bound forever by the verdict, the Court will grant a new trial, on payment of costs. This is the abstract of the Reporter. Now, I ask, is our case within this exception to the general rule? That was a involving real property; this, personal only. From their very nature, such questions about the realty, go back far into the past; and here, the Chief Justice says, “ The point that weighs most in this case, on the part of the application for a nen Rial, is, that it is a'quesiiou involved in great doubt, great obscuri1y, and of great value; and the verdict in tin's case hinds the right forever. In our ease, a woman upwards of fifty years old, had in the first place, to show her right to freedom. Then the Plaintiff had only to show, that Bennett had bought her of Bavis, who had bought her of Moses Parish, whose father had held her as a slave, from her birth; and I have shown, that, before the trial of the cause at Law, the Plaintiff was in possession of the clue, which led to the whole chain of title, and might, wilh ordinary diligence, have produced it. Again; in the case cited, the whole time given to investigate a most intricate and obscure land title, depending upon old customs, old grants, and parol evidence, ivas seven months; here, there were fourteen months from January to the March twelve months after. The.value involved here, ran, strictly speaking, he *152 taken to bo only the remnant of this old woman’s life. We hear, Indeed, that she has children; but, this is not assigned by the hill as 8 ground of new trial. We see from the record, that suits for the freedom of some of those children were depending, when this cause was tried. They are probably all decided before this; but, we know not how. The bill asks for no new trial in those cases. In all the material features of the two eases, therefore, there is so radical a difference, that the one cannot govern the other; and a further reason against granting a new trial for this cause, is, that the bill does not place it on this ground at ail, but exclusively on the ground of new evidence.
The Counsel for the Appellant also cited in favor of a new trial, the case of Jackson on the demise of Walcot v. Crosby, 12 Johns. 354. That was a case, in which both parties claimed under a soldier, to whom the patent had issued for the land in contest. The Court considered the new evidence as important: that the partji had not been guilty of gross neglect: that this was a peculiar class of cases, not governed, by the rules adopted in ordinary eases, and upon the whole, thought it best to grant a new trial. They cite no authority in support of their decision, while they acknowledge that it is a departure from the general course. I have shown (I think) that in this case, there is nothing peculiar, nothing to withdraw it from the general rule; that with ordinary diligence, all the evidence might have been procured before the trial; and that to grant' the new trial, would be to encourage negligence, and set a precedent most mischievous in its consequences.
Although I have examined carefully, and taken a note of every material deposition in this case, and could easily give my view aá to the weight of evidence on the question of freedom, I shall not do so, because I do not think that question before us. It was exclusively for the Jury. If there was any evidence, of which due diligence would have informed the Plaintiff, he must be taken to have known it. If he was not prepared to bring his case fully before the Jury, he'should have moved for a continuance, and showed thatthe evidence was material, and that he had used due means to obtain it. To have refused him a continuance in such a case, would have been error. But here, there was no motion for a continuance. The parties went freely to trial. The Plaintiff, in his bill, does not complain of fraud or unfairness in the tria!. He puts his case simply on the ground of new evidence. If he has shown that he has discovered this evidence since the trial, and that he could not, with due diligence, have discovered it before, he should have a new trial. But, if he has utterly failed, (as I think he has,) he ought not to have *154 a new trial, however strongly the evidence now produced may head upon the question of freedom.
I am for affirming the Decree.
Judge Coalter.
The Writ in the action at Law was issued on the 20th of February, 1821, returnable to the third Monday in March. Neither :he-Declaration, nor the proceedings in the Office, are copied into the record, nor the affidavits, on which the petition to be permitted to sue, was founded. In August, 1821, the suit was continued at the Defendant’s costs, and in November, at the Plaintiff’s. The. trial' took place on the 20th of March, 1822. The body of the deposition of Polly M’Kinney, the principal witness for the Plaintiff, was taken on the 8th of March, 1821, before the return dav of the Writ; and a supplement, to it, on the 20th of June, 1821, the day on which the issue was made up. The depositions of Humphrey Parish, Booker Parish and Aaron Parish, filed also in thh same cause, were taken on the 12th of March, 1821, and are said to he taken in a suit of Milly Chavis against William Bennett. They are. said to be taken in pursuance of a commission and notice annexed. So that, probably, she had first sued Bennett, her former master. JIow this matter is, it is not material to enquire into. Those depositions, either for this reason, or because they were hearsay principally, were not read. These matters are merely staled to show, ihat the suit was prosecuted with great celerity, and little delay on either side, so as to give but little time to search for distant witnesses.
The first witness proves, 'that in 1772, on a division of their father’s es!ate, Milly, a mulatto girl, then aged about two years old,, fell to Moses Parish their brother, and that he told him in 1773, or 1774, that ho had sold her to John Davis of Pittsylvania. The others prove similar declarations by their brother Moses, and that the girl in 1774, was about, three or four years old. It is in proof, that the Appellant is an aged and infirm man, entirely incapable of attending to, the defence of such a suit. lie states in his bill, that lie did not know of the existence of the widow of Moses Pa-risk, who, it appears, lived in Kentucky at the time of the trial; and that ho was also ignorant of the existence of (he Bill of Sale made by Moses Parish to Davis, which has since been fouud amongst the old papers of Davis in Tennessee, he being long since dead, lie proves by the deposition of Sally Davis, taken in December, 18°3, that in January preceding, Samuel Banrer, whs *155 Sfgfears to be the agent of the Appellant,.;aiade enquiries concerning ¿(Bill of Sale, supposed to have been made by Moses Parish to John Davis, sen’r. for a negro girl named Milly; and that her husband Jesse Davis, now deceased, told him there was a number of old papers of his father’s then in a desk in the house; and on examination, they found the Bill of Sale, of dn ancient date, and of a very ancient appearance, and which Burger took-away with him: that John Davis, sen’r. removed to that place about nineteen years before, and died about two years after his removal. Elizabeth Davis, daughter of Jesse Davis, and Field Davis, a son, prove also the search for, and finding, the Bill of Sale. This Bill of Sale is exhibited. He also proves by the deposition of Molly Parish, the widow of Moses Parish, that her husband sold a bright mulatto girl to John Davis, about four years of age at the time, about forty-nine years ago last April, (\her deposition, was taken in December, 1823:) that she has heard of her since, understood that Davis had sold her, and that she had had seven children, hut never saw her since. The other evidence in the record proves,' that Davis immediately sold her to Bennett.
The only evidence of identification of the Plaintiff at Law, said to have been stolen, then six or seven years old,, was a scar on her thigh, proved by Mrs. M’Kinney. The Appellant, in his bill, states, that at the time of the trial, he did not know of any witness, who could prove the manner in which the Plaintiff obtained the scar on her thigh. He now proves this by one witness positively, Who saw the wound when dressed. Her credit, however, is assailed. But, several other witnesses saw the Appellant when lame with a wound said to have been received in her thigh by a fall into a potatoe hole.
- Suppose it. had been competent for the .Court of Law to have heard a motion for a new trial on these grounds, after the discovery of this new evidence; ought it to have been granted? If only the poor remnant of this old woman’s life, had been in controversy, probably it would not, except as a protection to the Parish; though, if she was really of any value worth contending for, it might be another matter. But, when we consider the effect that this verdict may have on her progeny, whether in the hands of the Appellant or others, there can be no question that the case is one of sufficient value and magnitude to have demanded the.attention of the Court The Appellant’s age; the short lime between the institution and trial of the suit; the foreign residence of the witnesses; the existence •of the Bill of Sale from Parish to Davis, not even known to those ¿n possession of it until searched for: are all facts corr&borative of *156 .the statement in the bill, that he did not know of their existence •<>% the trial. The failure to state the time and manner in which the Bill of Sale was discovered and came to his knowledge, when both arc proved, ought not to deprive the Appellant, it seems to me, of the benefit of his allegation. So, too, as to the discovery of the witness Mrs. Parish. It is no where proved, that her existence was known to any one, from whom lie could have gotten the information He says he made cnqnries, hut could not learn.
What effect this evidence ought to have on another trial, or how far the witness who proves the wound on the thigh, corroborated by the other evidence, would he credited by the Jury on such trial, it would not be for a Court, in granting a new trial, to say. The evidence, both written and parol, is certainly pertinent to the issue, and might have an important effect on the trial; and I think, if it could be now exhibited to the Court of Law, that Court, considering the present liberality in granting new trials in such cases, ought to grant it. But, the party is deprived of that remedy by the adjournment of the Court, before the discovery of the new evidence; and by this means, will be deprived of what ho would otherwise be entitled to, unless a Court of Equity can relieve.
Under these circumstances, I think it is the province and duty of that Court to interfere, and direct an issue'to be made up in the usual way, in order to re-try before the Jury and a Court of Law, the right of the Appellee to her freedom. •
The President.
It does not appear that any negligence is imputable to Inc Appellant; on the conü’ary, his inability, from age and infirmity to attend to the defence of the suit, which is proved by the testimony ir.< ihc record, would, in a less difficult case, have been some excuse, for his failing to procure his testimony, in time for the trial at Law. Nor, is any fault imputable to the Appellee. Her delay in making her claim to freedom, may be attributed to her condition asa slave. But this, if she is entitled to freedom, is not imputable to the Appellant. She claims her freedoifi on facts, which, if true, occurred more than forty years ago; the evidence of which was to be met, by testimony to be found in another State, and a remote County; aud such is the obscurity of the cases that it is not surprising, that it was not known to the Appellant, within the fifteen months that elapsed, between the Writ and the verdict. It may be hard, that the Appellee should lose the benefit of a verdict in her favor; but, it would he unjust, that the Appellant should lose his property, without hav *158 trig the opportunity to prove that it is'his, by the evidence which i? now in the record. If it had been discovered after the verdict, and before the end of the Term in which it was found, I think there can be no doubt, that on motion, the Appellant would have been entitled to a new trial. The obscurity of the case, and the effect of the. verdict on the interests of others not parties to it, would, ppon the facts in the record, have been a proper ground for a new trial. In the ease of Swinnerton v. The Marquis of Stafford, 3 Taunt. 91, though conflicting evidence had been left to the J ury, and the Court did not think the verdict wrong, yet, as the case was involved in great doubt and obscurity, and of great value, a new trial was awarded. In the case before us, the main point turned on the identity of person; as to which, after the lapse of more than forty years, nothing can be more obscure and doubtful. The verdict, also, will materially affect property of great value to the holders of it. In the case of Jackson v. Crosby, 12 Johns. 354, the identity of a soldier or patentee of land, was the turning point in controversy; and though that was a recent case, compared with the one under consideration, as the Defendants, as was said by the Court, were not chargeable with gross negligence, in not having discovered the evidence before the trial, and the identity of the soldier, entitled to the land in question, involved in much doubt and difficulty, and about which there is usually much contrariety of evidence, granted a new trial; remarking, at the same time, that these were peculiar cases, as they certain - ]y are, and not to be governed by the rules adopted in ordinary eases. I do not cite this case as having any authority in this Court; but, as the decision of able Judges on a question quite analogous to the one before us, and in which I entirely concur.
I think that the Decree is erroneous, and ought to be reversed.
Decree reversed.*

 Judges Geeks and Oabbt.k, absent